## Rumney *vs.* Campton.

In order that a settlement may be acquired in the fifth mode prescribed by the act of January 1, 1796, which provides that any person who shall be chosen, and actually serve one year as a town officer liable to be fined for not accepting his office, shall thereby gain a settlement, the incumbent must be in a situation during the whole year to perform the duties of such office.

At the annual meeting in Campton, in March, 1807, K. was chosen tythingman. On the Saturday before the annual meeting in March, 1808, he left Campton, with the intention of not returning, and did not return before the end of the year, but his family remained in Campton for some time after—*Held*, that he did not gain a settlement in Campton.

Whether he did or did not lose his domicil thereby in Campton, *quere?*

Assumpsit, for the support of Abigail Kimball, a pauper, alleged to be chargeable to the town of Campton.

It was admitted that the town of Campton was liable for her support, and that the action was sustained, provided the settlement of her late husband, Timothy Kimball, was in Campton.

The plaintiff contended that said Kimball acquired a settlement in Campton in the fifth mode prescribed by the act of January 1, 1796, by being chosen tythingman at the annual meeting in March, 1807, and actually serving in that office one year.

It appeared that his family resided in Campton until the winter of 1808-9; that he went out of town not far from the annual meeting in 1808, and did not return until the winter of that year.

There was evidence on the part of Campton, tending to show that Kimball left Campton on the Saturday evening preceding the annual meeting in 1808, saying that a creditor had threatened to commit him to gaol on execution, and that, to avoid it, he would go to Berkshire, Vermont, where a brother resided, and that he was then on his way there.

The plaintiff offered evidence to show that Kimball did not leave Campton until the Monday evening preceding the annual meeting in 1808; and contended that, as he was duly

chosen by the town, and his family remained in town more than a year from his election, the presumption of law was that he had not changed his residence, and that the burden of proof was on the defendant to show that he had actually removed from the town; and further, that as he was domiciled in Campton with his family, and his family remained there, he could not be held to have removed from that place, until he had become fixed as a permanent resident in some other place.

The court instructed the jury, that it was not necessary to show particular acts of service performed by Kimball as a tythingman up to the close of the year; but the burthen of proof was on the plaintiff to show that he was an inhabitant of the town up to the close of the year—that if he remained an inhabitant of the town up to Monday night preceding the annual meeting in 1808, that was sufficient; but if he left on Saturday previous, they must enquire whether he left for a temporary purpose, to avoid the execution for a time, and with the intention of returning there to reside, or whether he left the town with the intention of returning there to reside no longer, and of taking up his residence in another place— that the fact that his family remained in the town was a circumstance to show that he was still an inhabitant, but was not conclusive—that it was not necessary that he should have acquired another domicil—that they must consider the whole evidence, and if he left on Saturday night, with the intention of not returning to live in Campton, but intending to fix his residence for the future in Vermont, their verdict must be for the defendant; but if his absence were intended to be temporary, then they should find for the plaintiff.

The jury returned a verdict for the defendant, and the plaintiff moved for a new trial.

*Quincy, & J. Bell*, for the plaintiff. Where a man has once acquired a domicil, and his family have been there left, the domicil remains until another has been acquired elsewhere.

Rumney *v.* Campton.

This principle has in substance been recognized in *Rising* vs. *Granger*, 1 *Mass. R.* 48. He remains an inhabitant until a domicil is acquired. *Williams* vs. *Whitney*, 11 *Mass.* 424.

A domicil is not lost by abandonment merely. *Granby* vs. *Amherst*, 7 *Mass. R.* 1; *Cutts & al.* vs. *Haskins*, 9 *Ditto* 547; *Harvard College* vs. *Gore*, 5 *Pick. R.* 370, 378; but a new domicil must be also acquired. *Jennison* vs. *Hapgood*, 10 *Pick. R.* 98.

And the domicil is not to be defeated " *animo*" merely, but " *animo et facto.*" *Case of Dr. Munroe*, 5 *Mad. Ch. R.* 379.

There should be, not only declarations of an intention to abandon the domicil, and an actual residence elsewhere, but an express intention to reside in such other place. The policy of the law is to encourage a fixed residence, that the domicil may be ascertained.

*Bartlett*, for the defendant. A settlement may be gained under the pauper laws, so as to render a town liable for the support of a pauper, and yet he may not have obtained a domicil there for the purpose of executing an office. The case of *Exeter* vs. *Brighton*, 3 *Shepley* 58, establishes this position. It was there held, that where a pauper left a town prior to March 21, 1821, without any intention of returning, and did not return, he gained no settlement in that town by the settlement act of that date, although he had acquired no home in another place.

Gilchrist, J. It is not necessary, in order to settle the question before us, to examine at much length the difficult and extensive question of domicil. Mr. Justice Story, in his work on the Conflict of Laws, has treated the subject with his accustomed accuracy and ability. It is there stated, *Confl. of Laws* 43, that " it is sometimes a matter of great difficulty to decide in what place a person has his domicil. The residence is often of a very equivocal nature, and the intention still more obscure. Both are sometimes to be gath-

ered from slight circumstances, of mere presumption and conflicting acts. An intention of permanent residence may often be engrafted upon an inhabitancy for a special or fugitive purpose."

The learned author has collected together some of the more important rules which have been generally adopted as guides in the cases of more familiar occurrence, the ninth of which is, (*Confl. of Laws* 46,) that the place where a married man's family resides is generally to be deemed his domicil ; and the fourteenth, that mere intention to acquire a new domicil, without the fact of removal, avails nothing ; neither does the fact of removal without intention.

*Vattel, Law of Nations, book* 1, *ch.* 19, § 218, defines *domicil* as " the habitation fixed in any place, with the intention of always staying there." In the case of *Putnam* vs. *Johnson & al.*, 10 *Mass. R.* 488, in which the question was as to the right of the plaintiff to vote in the town of Andover, Mr. Justice Parker considers the definition of Vattel as too strict, if taken literally, to govern in a question of that sort, and says, " probably the meaning of Vattel is, that the habitation fixed in any place, without any present intention of removing therefrom, is the domicil." And this construction is approved by Mr. Justice Story. The doctrine of the case of *Williams* vs. *Whitney & al.*, 11 *Mass. R.* 424, cited by the counsel for the plaintiff, is, that if a person having a family be domiciled in a town, he will not be considered as having changed his domicil by removing into another town, until he also removes his family. In the case of *Exeter* vs. *Brighton*, 3 *Shepley* 58, cited by the counsel for the defendant, it is said that a home may be relinquished and abandoned, while the domicil of the party, upon which many civil rights and duties depend, may, in legal contemplation, remain.

If, therefore, the question before us were to be determined by the domicil of Kimball, unconnected with other considerations, it might deserve serious inquiry, whether the change

of domicil is sufficiently made out to relieve the defendant from the liability to repay the sums advanced by the plaintiff.

But we think this inquiry is not necessary, and that the case must be settled on different grounds. If the settlement of Kimball be in the town of Campton, it is so by virtue of the fifth clause of the act of January 1, 1796. *N. H. Laws* 362, (*Ed. of* 1815.) This clause provides, that any person who shall be chosen and actually serve one year as a town officer, liable to be fined for not accepting the office, shall thereby gain a settlement in the town. The third section of the act of February 8, 1791, *N. H. Laws* 241, (*Ed. of* 1815,) imposes a penalty upon any person elected to a town office who shall neglect to take the oath of office within six days after his election, and tythingmen are there enumerated among town officers.

The only question, therefore, is, whether, upon a sound construction of the act of January 1, 1796, Kimball can be considered as having actually served one year in the office of tythingman, and thereby acquired a settlement in Campton.

The proper mode of construing statutes which prescribe the modes in which settlements may be gained, has been settled by a long course of judicial decisions. Various modes of gaining a settlement have been at different times adopted by the legislature. One mode is the payment of taxes ; and that appears to have been adopted from other considerations than convenience alone ; for it is but just that the town which has received the benefit of the taxes should support the tax-payer, if he becomes destitute. *Jaffrey* vs. *Cornish, ante* 505. But it is to be considered that these rules of settlement are mostly arbitrary, and not in general founded upon any particular view to their superior natural justice, but established to operate prospectively, so as to produce future equality among the several towns in the state. Questions of legal settlement have, therefore, very properly been held to depend upon a strict and precise application of the rules of positive law, so as not to throw any burthen upon

any town, unless it should manifestly be liable according to the principles and regulations adopted by the legislature, as the best general rules which could be devised for the common convenience. *Paris* vs. *Hiram*, 12 *Mass. R.* 262 ; *Danvers* vs. *Boston*, 10 *Pick. R.* 513 ; *Billerica* vs. *Chelmsford*, 10 *Mass. R.* 394.

There are several cases in the books in which the question is discussed, whether a pauper had gained a settlement by the service of a year in a particular office. In *Burrow's Settlement Cases* 81, *page* 230, there is a case in which a service of one whole year was necessary to give a settlement, and the pauper was removed from the parish by order of the sessions, before the year expired ; and it was contended that the removal at the instigation of the parish should not discharge them. But it was held that, the removal being lawful, the office terminated, and so no settlement was gained.

In the case of *Paris* vs. *Hiram*, 12 *Mass. R.* 262, one West was chosen constable of Hiram on the 15th of April, 1811, and performed the duties of his office until the 28th of March, 1812, when he was committed to prison in Paris by virtue of an execution, and remained there until the 10th of May following. While in confinement he was supported by the town of Paris as a pauper, and this action was brought to recover the sums expended, of the town of Hiram. But it was held, that in order to gain a settlement in Hiram he must actually have served in the office *during the whole year*—the true construction of the statute being, that he must continue *capable of serving* whenever his services may be lawfully required.

In the case of *Barre* vs. *Greenwich*, 1 *Pick. R.* 129, one Freeman was chosen constable in Greenwich, on the 6th of April, 1817, and performed the duties of his office until the 20th of March, 1818, on which day he removed with his family to Barre, with the intention of residing there, and did reside there from that time. He intended to perform his official duties in Greenwich for the remainder of the year, and had made

arrangements for that purpose, but was prevented by sickness. It was held by the court, that although it might have been possible for him to perform his official duties in Greenwich from the 20th of March until the expiration of his official term, still that a person could not serve one whole year in a town office, so as to gain a settlement thereby, unless he lived within the town that year, so that the office should all the time be filled in such manner that a new choice could not be made ; and that the removal into another town, with an intention to remain there, created a vacancy, so as to interrupt the settlement. It was also held that town officers must be inhabitants of the town in which they are chosen, and that they cease to be officers when they cease to be inhabitants.

So, where a surveyor of highways removes from the town in which he was chosen, for the purpose of permanently residing in another town, he is no longer in a situation to discharge the duties of his office. The removal is considered as *ipso facto* a resignation of his office ; and, if he remove before the end of the year, he does not serve a year, within the meaning of the act of January 1, 1796, so as to gain a settlement. *Acworth* vs. *Lyndeborough*, 2 *N. H. Rep*. 295.

In *Shelburne* vs. *Norwich*, 16 *Johns. R*. 138, the pauper was elected to the office of constable of Shelburne in March, 1816. He acted as constable until the 18th of December, when he was committed to gaol at Norwich, on an execution, and remained there thirty days. On the 18th of January, 1817, he removed his family to Norwich. It was held that he could not be considered as executing the office of constable of Shelburne after the removal of his family, although he did some acts in his official capacity after he had removed from the town of Shelburne.

The above cases show the strictness with which the statute has been construed, and fully authorize the instructions of the court. The pauper left the town of Campton with the intention of not returning ; and he did not return during

the year for which he was elected. He cannot be said to have actually served one whole year in the office of tythingman. There was a substantial portion of the year in which he was not in a situation to perform the duties which might lawfully have been required of him. His absence upon the Sabbath, which, had he not held this office, would have been no more important than his absence upon any other day, was, in his situation, material. The office of tythingman was constituted by the legislature with peculiar reference to the Sabbath. It was the duty of this officer to inform of all breaches of the " Act for the better observance of the Lord's Day." He was empowered to stop and detain all persons he should suspect of unnecessarily travelling on that day ; and this duty and power he could not exercise unless he were within his precinct. We are, therefore, of opinion that he did not serve one year in that office, so as to gain a settlement in Campton, and that there must be

*Judgment on the verdict.*